SILBERMAN, Chief Judge.
E.R.-J. seeks review of the order terminating his parental rights to his five-year-old daughter, N.R.-G., based on his failure to substantially comply with his case plan. We reverse because the Department of Children and Family Services failed to establish by clear and convincing evidence that the case plan noncompliance was substantial and not beyond his control.
In March 2007, eight-month-old N.R.-G. and her four-year-old brother A.G. were sheltered based on a report that the children’s mother, V.G., was physically abusive toward A.G. At the time of the proceedings, the children were living with the Mother and E.R.-J., who is the father of N.R.-G. and will be referred to hereinafter as “the Father.” The Mother was charged with aggravated child abuse based on her treatment of A.G. She entered a plea, was sentenced, and was deported to Mexico. The Department was unable to locate A.G.’s father, M.B.-V., throughout the entire course of the proceedings.
The Mother and the Father consented to the petition for dependency. The allegations against the Father were based on *576 excessive corporal discipline[1] and neglect as evidenced by the children’s tooth decay,[2] the family’s dirty living conditions, and N.R.-G.’s untreated labial adhesion. The Father subsequently completed the parenting requirements in his case plan and passed a home study. In October 2007, N.R.-G. was reunified with the Father, and A.G. was also returned to his custody.
The children were sheltered for a second time five months later in March 2008 after the Father moved to a residence his case manager deemed inappropriate.[3] This residence was a makeshift garage bedroom on the side of a home shared by several others. The home study did not reveal hazardous living conditions in the residence, and all of the home’s residents passed a background check. However, the residence was deemed inappropriate because some of the male residents were also sleeping in the same room as the children. The Father subsequently relocated and obtained an approved homestudy, and N.R.G. and A.G. were returned to his custody a second time in early 2009.
Shortly after the children were returned to his custody, the Father relocated with them to Oklahoma. The Father had moved out of state because the children’s maternal grandfather offered to provide housing there and the Father was able to obtain employment there. But the Father moved without notifying the Department, and the children were reported missing. The Department had some difficulty locating the children because the Father delayed enrolling A.G. in school. When the Father attempted to enroll A.G. in school in August 2009, the Department located the children and returned them to Florida.
The Father’s case manager met the children at the airport in Oklahoma and observed that A.G. was well-groomed. The case manager described three-year-old N.R.-G. as “unkempt” in that “[h]er hair wasn’t combed, she had a chipped tooth, she had bruising that looked like old bruises on her legs, and her clothes fit snugly.” N.R.-G. was also wearing a diaper even though the case manager had been informed that she had been “almost completely” potty trained in foster care.
In September 2009, the Father attended a Department staffing and was informed that the Department was going to change his case plan goal to adoption based on the fact that the children had been sheltered for a third time. The Department amended the case plan as indicated. The Father, who was still residing in Oklahoma, hired a private attorney and attended a judicial review hearing on November 18, 2009. The court subsequently entered an order on the hearing which contained a provision precluding the Father from having contact with the children except by telephone. Two days later, the Father’s attorney served a motion to amend the case plan goal to reunification. The Father returned to Florida permanently some time before the end of November.
On December 28, 2009, the Department filed a petition for termination of parental rights as to both children. The petition alleged the following grounds: abandon *577 ment of N.R.-G. under section 39.806(l)(b), Florida Statutes (2009); engaging in conduct demonstrating that the Father’s continuing involvement threatened N.R.-G.’s life, safety, well-being, or health under section 39.806(l)(c); and failing to substantially comply with the case plan under section 39.806(l)(e). Two days later, the court granted the Father’s motion to amend the case plan, and the case plan goal was changed to reunification with a concurrent goal of adoption. A month later the Department refiled its petition for termination of parental rights.
In April 2010, the Father attended a judicial review after which the court determined he had partially complied with his case plan. The only tasks remaining for the Father to complete were to maintain stable housing and employment and to demonstrate that he had benefited from previous services. The Father thereafter provided his case manager with some pay stubs as proof of employment. The Father had housing, but he was living in close quarters with several roommates. And the Department had previously deemed a similar housing arrangement inappropriate based on the absence of private sleeping quarters for the children.
Due to the fact that a no-contact order had been entered, the Father did not visit with N.R.-G. until a supervised visit was arranged in May 2010 for purposes of a parenting assessment.[4] This visit was observed by the Father’s case manager and the licensed mental health care provider (LMHC) who conducted the parenting assessment. The visit took place for thirty minutes at a McDonald’s, and it was the first time N.R.-G. had seen the Father since she had been removed from his custody approximately nine months previously-
Three-year-old N.R.-G. was extremely uncomfortable with the Father when he tried to engage her during the visit. Her body became tense, she stopped talking, she avoided eye contact with the Father, and she cried at one point. N.R.-G. did not respond to the case worker or LMHC in the same manner during the visit. Based on this response, the LMHC concluded that the Father’s relationship with N.R.-G. was “distressed.” The LMHC determined that, without therapy, any subsequent visitation with the Father would be detrimental to N.R.-G. But with two to three months of therapy N.R.-G. may be able to successfully visit with the Father.
N.R.-G. was not provided any such therapy, and the no-contact order stayed in place while the parties awaited the adjudicatory hearing on the Department’s termination petition. However, the adjudicatory hearing, which was originally scheduled for August 3, 2010, was delayed while the Department investigated a potential placement with the maternal grandfather in Oklahoma. For reasons not developed in the record, that placement was not approved.
In December 2010, the court ordered a second parenting assessment. The no-contact order was again lifted so that the Father could visit with N.R.-G., who was now four years old, for purposes of this assessment. The visit was conducted in January 2011 and was observed by Dr. Leslie Swanson, the psychologist who conducted the parenting assessment. The visit took place for an hour at a visitation center and it was the first time N.R.-G. had seen the Father since her thirty-minute visit at the McDonald’s approximately *578 eight months previously. N.R.-G. was nervous during the visit and did not return the Father’s affections. She avoided making eye contact with the Father and was very distracted.
In February 2011, the Father attended a judicial review after which the court determined he was still only in partial compliance with his case plan. The court again concluded that the Father had not obtained stable housing and employment or demonstrated that he had benefited from previous services.
The adjudicatory hearing was held in May and June 2011, and the Mother and A.G.’s father, M.B.-V., were deemed to have consented to termination based on their failure to appear. The Department abandoned its allegations against the Father under sections 39.806(l)(b) and (c) and proceeded with termination under section 39.806(l)(e) based solely on his failure to substantially comply with his case plan.
At the adjudicatory hearing, the LMHC and Dr. Swanson testified regarding their observations of the Father’s two visits with N.R.-G. Dr. Swanson also testified regarding a psychological evaluation of the Father she conducted as part of her parenting assessment. Based on the Father’s responses to various hypotheticals she offered during the interview portion of the assessment, Dr. Swanson concluded that the Father had not learned about the importance of a structured environment and discipline during his parenting classes. But Dr. Swanson acknowledged that there was a language barrier that invalidated the results of part of her psychological evaluation. The Father speaks Spanish and little or no English. Although the Father was provided an interpreter, many of Dr. Swanson’s questions did not translate well and she was unsure that he understood what she was really asking.
Nonetheless, Dr. Swanson concluded that the Father’s prognosis for successful parenting was poor. Dr. Swanson believed that the Father had not benefited from services and was naive about his ability to properly care for N.R.-G. Dr. Swanson was especially concerned because the Father could not articulate any clear plans for suitable housing arrangements.
The Father’s case manager testified regarding the circumstances of the Department’s locating and retrieving the children from Oklahoma in August 2009. She also testified that the Father was noncompliant with his case plan because he had not been able to offer proof of appropriate housing or. current employment. As to proof of employment, the Father had provided the case manager with pay stubs up until August 2010. After that he changed jobs and told the case manager that he no longer received pay stubs because he was paid in cash. The case manager suggested he get a notarized letter verifying his income from his employer, but he failed to do so.
The case manager echoed Dr. Swanson’s opinion that the Father had not benefited from the services provided by the Department. Nor did she believe that N.R.-G. could be safely returned to the Father’s custody. Her opinion was gleaned from her observation of the Father’s two visits with N.R.-G. and her review of his file. Finally, the case manager testified that she felt that permanency was long overdue for N.R.-G.
The Father testified through an interpreter. He said he had a fourth-grade education. He was currently working in construction, and he provided his employer’s name and phone number. The Father was earning eight dollars an hour and worked between thirty and thirty-five hours a week for a total of between $280 and $320. He could not provide a pay stub because he was paid in cash. The Father *579 insisted he has consistently held a job since the onset of the proceedings.
The Father testified that he was currently living in a two-bedroom apartment with a woman, her husband, their two children, and two other adults. He was living with so many people because he could not afford his own place. He claimed he would try to find his own two-bedroom apartment if N.R.-G. was returned to him. He would like to take the children back to Oklahoma to live with the maternal grandfather, but he would stay in Florida if the court directed him to do so. The Father testified he has never hurt either child, and he did everything the Department asked him to do. He believed he was able to provide suitable care for both N.R.-G. and A.G.
The trial court bifurcated the adjudicatory hearing so that the best interests of the child were addressed at a second hearing in June 2011. The State recalled the current case manager, who testified that termination was in N.R.-G.’s manifest best interests. Counsel for the Department then asked the case manager whether each of the best interest factors as set forth in section 39.810 was satisfied in this case. Without providing factual support for most of her conclusions, the case manager answered “yes” or “no” to questions that parroted each of the factors.[5]
The Guardian ad Litem testified that he had reviewed the record, interviewed some of the parties, and observed N.R.-G. in her foster placement and during her telephonic visitation with the Father. The Guardian concluded that it would be in the manifest best interests of N.R.-G. to terminate the Father’s parental rights. The Guardian concurred with Dr. Swanson and the case manager’s opinions that the Father has not benefited from the parenting classes.
The court thereafter entered a final judgment terminating both parents’ rights to N.R.-G. and terminating the Mother and M.B.-V.’s parental rights to A.G. The court found that termination as to the Father was proper based on his failure to substantially comply with his case plan under section 39.806(l)(e). The court also concluded that the Father’s failure to comply with his case plan was not due to his lack of financial resources.
Under section 39.806(l)(e), termination is proper when the court has adjudicated the child dependent, the Department has filed a case plan, and “[t]he child continues to be abused, neglected, or abandoned by the parent.” A parent’s failure “to substantially comply with the case plan for a period of 9 months” is sufficient evidence of such continuing abuse, neglect, or abandonment unless this failure was caused by the parent’s lack of financial resources or to the Department’s failure to provide reasonable efforts toward reunification. Id. “ ‘Substantial compliance’ means that the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child’s remaining with or being returned to the child’s parent.” § 39.01(73).
In order to terminate parental rights, the Department must prove the allegations in its petition by clear and convincing evidence. See R.C. v. Dep’t of Children & Family Servs., 33 So.3d 710, 714 (Fla. 2d DCA 2010). A trial court’s finding of clear and convincing evidence is *580 presumed correct but should be reversed if clearly erroneous or not supported by competent, substantial evidence. Id.
The trial court found that the Father breached his case plan in four material aspects: (1) intentionally absconding to Oklahoma, (2) concealing the fact of his relocation to Oklahoma, (3) failing to obtain approved housing, and (4) continuing to neglect N.R.-G. despite the completion of parenting classes. Because these breaches did not pose any danger to N.R.-' G.’s well-being and safety and were attributable to the Father’s lack of financial resources and the Department’s failure to provide services, we conclude they are not sufficient to support a finding that the Father failed to substantially comply with his case plan.
The failure to comply with a case plan is not sufficient, in and of itself, to support a termination of parental rights. N.F. v. Dep’t of Children & Family Servs., 82 So.3d 1188 (Fla. 2d DCA 2012); R.F. v. Dep’t of Children & Family Servs., 22 So.3d 650, 654 (Fla. 2d DCA 2009); I.Z. v. B.H., 53 So.3d 406, 410 (Fla. 4th DCA 2011). Instead, the Department must also present clear and convincing evidence of abuse, neglect, or abandonment. And while a parent’s failure to substantially comply with a case plan may constitute clear and convincing evidence of abuse, neglect, or abandonment, such a finding also requires clear and convincing evidence that the circumstances that resulted in the case plan’s creation were not sufficiently remedied so that the children’s well-being and safety would be endangered by reunification. N.F., 82 So.3d at 1192; R.F., 22 So.3d at 654.
In this case, there was no evidence that N.R.-G.’s well-being and safety was endangered by any of the Father’s alleged breaches of the case plan. The children had originally been sheltered based on allegations of abuse by the Mother and excessive corporal punishment and neglect by the Father. But the Mother has been convicted and deported, and the Father remedied the excessive corporal punishment and neglect by complying with his first case plan. From that point on, there was no evidence that any conduct by the Father endangered N.R.-G.’s well-being and safety. In fact, the only evidence regarding this subject came from the case manager’s testimony concerning N.R.-G.’s “unkempt” appearance and potty-training lapse on one occasion in August 2009. But there was no evidence of any actual or threatened harm to N.R.-G.’s well-being or safety arising from this testimony.
And, contrary to the trial court’s findings, the evidence established that the Father’s noncompliance with the case plan was due to his lack of financial resources or the Department’s failure to provide reasonable efforts toward reunification. “[P]arental rights cannot be terminated simply because the parent is poor, uneducated, and without sufficient financial resources to care for her children in the manner the Department deems advisable, or because she has not been a model parent.” T.C.B. v. Fla. Dep’t of Children & Families, 816 So.2d 194, 197-98 (Fla. 1st DCA 2002).
The main issue in this case is the Father’s inability to obtain what the Department deemed “suitable” housing. The Father was able to procure housing in conditions that were not hazardous and with roommates who passed a background cheek. The problem with the Father’s housing situation was that he had to settle for cramped living arrangements with several roommates and could not arrange for private sleeping quarters for the children. But the Father testified that he earned between $280 and $320 per week and *581 could not afford his own place. And while the trial court concluded that the Father had the financial ability to obtain his own place, the court relied on the fact that the Father had been able to do so in the past even though the Father was never able to sustain those living arrangements. The court also relied on the Father’s assertion that he would “try” to find his own two-bedroom apartment if the children were returned to his custody. However, the Father’s intentions, while noble, are not grounded in fact.
As they concern his inability to obtain suitable housing, the facts of this case are analogous to those in Henderson v. Department of Health & Rehabilitative Services, 480 So.2d 198 (Fla. 5th DCA 1985). In Henderson, the mother had given birth to the children when she was fourteen and sixteen. Id. at 199. She had received a tenth-grade education and lived with her mother and several adult siblings in a small home in “crowded, squalid conditions.” Id. The children had been sheltered after the mother was ordered out of the house and she left them behind with the grandmother, “unattended and neglected.” The children were declared dependent, and the mother entered into a series of case plans. The mother made a substantial effort to comply with the case plans but was essentially stymied by her inability to obtain suitable housing and employment. The mother had made efforts to obtain government assistance, but they were unsuccessful.
The Fifth District reversed the order terminating the mother’s parental rights based on her failure to substantially comply with her case plan. Id. at 200. The court concluded, “[The mother’s] parental rights are in jeopardy in this case primarily because she is poor, uneducated, and without sufficient financial resources to care for her children in the manner the Department deems advisable. These are insufficient, reasons to terminate parental rights.” Id. at 199. Instead, the court recognized that the mother’s parental rights could not be terminated absent “clear and convincing evidence of neglect, abuse or abandonment by the natural parent.” Id. at 200. And while the mother may have failed to comply with certain aspects of her case plan, those failures were “beyond her ability and control.” Id. Cf. M.M. v. Dep’t of Children & Family Servs., 867 So.2d 573, 574 n. 1 (Fla. 3d DCA 2004) (affirming termination of the mother’s parental rights based on her failure to obtain appropriate housing and employment because the mother’s “lackadaisical approach to completing her ease reunification plan evidences an unwillingness on her part to organize her life in such a fashion as to care for her children”).
As with the mother in Henderson, the Father’s inability to maintain adequate housing was due to factors beyond his control. The evidence established that he was consistently employed, and there was no dispute that he was earning the best salary he could with a fourth-grade education and his language limitations. And, unlike the mother in M.M., there was no evidence that the Father was lackadaisical in his efforts. In fact, he tried within his limited means to provide safe housing for the children, he went through the effort of obtaining private counsel, and he sacrificed a job in Oklahoma to return to Florida to defend his parental rights.
As for the Father’s breaches of the case plan by relocating the children to Oklahoma and concealing their presence there, the evidence established that the relocation was motivated in large part by the Father’s need for housing. The Father testified that he would like to take the children back to Oklahoma but asserted he *582 would stay in Florida if so directed. And the trial court did not express any concerns that the Father would abscond with the children.
The only remaining breach is the Father’s alleged continued neglect of N.R.-G. despite the completion of parenting classes. This breach was based on the testimony of the case manager, the LMHC, Dr. Swanson, and the Guardian. Their opinions centered around N.R.-G.’s negative reaction to the Father during their visits and the Father’s inappropriate responses during Dr. Swanson’s interview.
The reliance on N.R.-G.’s negative reaction to the Father during visitation is problematic because the Father was only permitted two relatively brief visits that occurred at least eight months since the last time the Father had seen N.R.-G. Moreover, Dr. Swanson herself testified that with two to three months of therapy N.R.-G. may be able to successfully visit with the Father. But the Department has provided no such therapy. As to Dr. Swanson’s interview, she testified that there were significant language barriers even though the Father used an interpreter. And, to come full circle, Dr. Swanson was especially concerned because the Father could not articulate any clear plans for suitable housing. Here again, the Father’s efforts were stymied by circumstances beyond his control.
Because the Father’s breaches of the case plan did not pose any danger to N.R.G.’s well-being and safety and were attributable to the Father’s lack of financial resources and the Department’s failure to provide services, they are not sufficient to support a finding that the Father failed to substantially comply with his case plan. Thus, the Department failed to establish by clear and convincing evidence that termination was proper under section 39.806(l)(e). We therefore reverse and remand with directions for the trial court to reinstate the Father’s case plan in order that the Father may receive the proper services to assist with the goal of reunification.
Reversed and remanded.
NORTHCUTT and VILLANTI, JJ„ Concur.

. Although A.G. is not the Father's biological child, the petition contained allegations pertaining to both children.

. The Department originally alleged that baby N.R.-G. had rotten teeth, but it later clarified that it was A.G. whose teeth were rotten.

.Although the shelter petition also contained allegations that the Father was not using car seats for the children and had failed to provide proof of employment, the case manager testified that the main reason the children were sheltered was the Father's inappropriate housing.

. It appears the Father regularly exercised his right to some telephonic communication with the toddler. However, due to N.R.-G.’s young age, the toddler was unable to engage in any meaningful conversations.

. While not necessary to our holding today, we note that the case manager’s testimony suffered from the same deficiency based on the lack of factual basis as recognized by this court in N.F. v. Department of Children & Family Services, 82 So.3d 1188, 1194-95 (Fla. 2d DCA 2012).